# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 6:94CR302 |
| | ) | |
| TIMOTHY ADAMS | ) | |

**MEMORANDUM ORDER**

This matter is before the Court on Defendant Timothy Adams' Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A), (see Pet. for Compassionate Release ("Motion" or "Mot.") [Doc. #438]), which the Government opposes, (see Gov't's Resp. to Def.'s Mot. for Compassionate Release under 18 U.S.C. § 3582 ("Gov't Resp.") [Doc. #449]).  For the reasons explained below, the Motion is denied.

I.

Adams is nearing the completion of a lengthy term of imprisonment for his 1995 conviction for felony drug offenses, after his life sentence was commuted to 360 months on August 3, 2016. (See J. (Aug. 25, 1995) [Doc. #93]; Executive Grant of Clemency (Aug. 3, 2016).)  He believes his "deteriorating health and the prognosis confronting the state of [his] brain tumor" warrant compassionate release. (Mot. at 2.)  In support of his Motion, Adams filed a May 2013 Radiology Report, notes from two office visits to a

neurologist, Dr. Ariel F. Abud, in March 2017 and September 2018, his Medical Duty Status with the Bureau of Prisons completed in October 2018, and various records and certificates for coursework and programming completed in the Bureau of Prisons. (See [Doc. #438 at 7-23].) In response, the Government submitted a declaration by the Clinical Director at FCI Fort Dix, where Adams is presently an inmate, who has access to Adams' medical records and is familiar with his condition. (See Decl. of Nicoletta Turner-Foster, M.D. ¶¶ 1, 2 (June 24, 2019) [Doc. #449-2].)

II.

After suffering dizziness and hearing sensitivity, (Radiology Report), Adams underwent surgery in 2013 to remove a lesion[1] in his brain, only part of which was removed so as to avoid permanent neurological damage, (Office Note (Mar. 30, 2017)[2]). Fortunately for Adams, "[t]he tumor was diagnosed as a dermoid/epidermoid tumor, which is benign." (Decl. of Turner-Foster ¶ 3.) "The tumor has never been diagnosed as cancerous, nor does [Adams] require an evaluation by Oncology." (Id.)

---

[1] Adams and the Clinical Director at FCI Fort Dix describe a "tumor" as having been removed. (Mot. at 2; Decl. of Turner-Foster ¶ 3 (also referring to the removal of a "mass").) Dr. Abud refers to a "lesion" as having been removed. (Office Note (Mar. 30, 2017) (noting a "lesion") & Office Note (Sept. 25, 2018) (describing a "vascular lesion") [Doc. #438 at 8, 10].)
[2] Dr. Abud mistakenly dates Adams' surgery to February 2015, but both Adams, (Mot. at 2), and Dr. Turner-Foster, (Decl. of Turner-Foster ¶ 3), note his surgery date as 2013.

Adams visited Dr. Abud on March 30, 2017 primarily complaining of hyperacusia[3] and vertigo with occasional headache episodes, apparently exacerbated when he was not using earplugs. (Office Note (Mar. 30, 2017).) Adams also complained of blurry vision, earache, chronic sinus problems, frequent headaches, and lightheadedness. (Id.) Dr. Abud performed a complete neurological examination which revealed no nystagmus, no hearing difficulties, no weakness of the upper or lower extremities, symmetrical deep tendon reflexes, and unremarkable sensory results. (Id.) Ultimately, Dr. Abud recommended vertigo rehabilitation and use of earplugs. (Id.) And, while he did not have the disc from Adams' most recent MRI, based on the information provided to him, Dr. Abud believed there was no recurrence of the tumor. (Id.)

After having had another MRI "that showed basically the same thing", Adams returned to see Dr. Abud on September 25, 2018, with complaints of dizziness, hyperacusia, and vertigo, but no headaches. (Office Note (Sept. 25, 2018).) Again Dr. Abud reviewed Adams' systems and performed a complete neurological examination that was "unremarkable" after which Dr. Abud's only recommendation was to avoid keeping Adams "in an area where there is too much noise as hyperacusia gives him problems and makes his headaches worse." (Id.) Accordingly, on October 1, 2018, the Bureau of Prisons

---

[3] Hyperacusis is defined as "abnormally acute hearing". *Hyperacusis*, Merriam-Webster (providing medical definition), https://www.merriam-webster.com/medical/hyperacusis.

3

completed a Medical Duty Status report on Adams noting that he was to be restricted from all sports, ladders, driving, and working around potentially dangerous machinery and that he was not to "work or live in areas where there is too much noise as hyperacusia gives him problems and make his headaches worse." (Medical Duty Status.)

Since his 2013 surgery, "Adams has undergone routine MRIs" which "reveal a stable, post-surgical mass . . . with no indication that he requires additional surgery or other intervention at this time." (Decl. of Turner-Foster ¶ 4.)

Adams argues that "the surgery helped to alleviate symptoms and has enabled [him] to function the past few years"; however, the "state of [his] health has now reached the point where [his] prognosis is dismal and [his] immediate symptoms [of hyperacusis, vertigo, and overwhelming pain in his head] are worsening at an alarming rate." (Mot. at 2.) "The frequency of [his] need to lie down in a completely silent environment has rendered it impossible to properly function in custody." (Id.) He "will always have persistent symptoms of vertigo and tinnitus caused by the brain tumor" and will never again play sports, swim, climb a ladder, drive, or work around potentially dangerous machinery[4]. (Id.) He believes that continued imprisonment "will

---

[4] In his Motion, Adams sources these latter restrictions to Dr. Ellen Mace-Leibson, (see Mot. at 2); however, it is not apparent from the record who Dr. Ellen Mace-Leibson is.

4

deprive [him] of needed medical care", while "there is no question that on supervised release [he] will have the opportunity to obtain essential medical care that is not available in prison." (Id. at 3.) He will then "be able to find oncologists capable of performing supplemental surgery and chemotherapy". (Id.)

According to Bureau of Prison records, on December 27, 2018, Adams submitted a request for a Reduction in Sentence/Compassionate Release to the warden of FCI Fort Dix. (Decl. of Corrie Dobovich ¶ 3 (June 2, 2019) & Attach. A [Doc. #449-1].) Adams contends that he submitted an Inmate Request to Staff on February 7, 2019. (Mot. Attach. 1 (Letter from Adams to Clerk [Doc. #438-1]).) It was not until March 12, 2019 that the Warden denied Adams' request. (Decl. of Dobovich ¶ 3 & Attach. B.) After having received no relief from the Bureau of Prisons, Adams filed the instant motion.[5]

III.

In 2018, Congress passed the First Sept Act, Pub. L. 115-391, 132 Stat. 5194, which, among other things, amended 18 U.S.C. § 3583(c)(1)(A) to permit a defendant, in addition to the Director of the Bureau Prisons, to move for a sentence reduction, provided that he has exhausted his administrative

---

[5] While it matters not because the Government concedes that Adams' motion can be reviewed on its merits, see infra at 6, it is not entirely clear when he made the instant Motion. (Compare Mot. Attach. 1 (Letter from Adams to Clerk ("As of today, March 10, 2019, . . . ")) with Mot. Attach. 2 (Envelope dated Mar. 26, 2019).)

5

remedies or thirty days have passed without action since his request to the warden for a sentence reduction. If there are "extraordinary and compelling reasons"[6] warranting a reduction and "a reduction is consistent with applicable policy statements issued by the Sentencing Commission", a court may reduce the term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable". 18 U.S.C. § 3582(c)(1)(A)(i).

A.

First, it must be determined if Adams "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf" or if there were a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility" before he filed the instant Motion. See 18 U.S.C. § 3582(c)(1)(A). The Government concedes that by the time Adams filed his Motion with this Court, thirty days had lapsed since the receipt of his request by the warden without the warden's response and, therefore, he "is entitled to review of the merits of his claim." (See Gov't Resp. at 7.)

B.

The Court must next consider whether extraordinary and compelling reasons warrant a reduction in Adams' sentence. See 18 U.S.C. §

---

[6] The statute also provides relief to defendants "at least 70 years of age" who meet certain criteria, see 18 U.S.C. § 3582(c)(1)(A)(ii); however, this provision is inapplicable here as Adams is not at least 70 years of age, (see Radiology Report, Office Note (Mar. 30, 2017), & Office Note (Sept. 25, 2018) (each providing date of birth)).

6

3582(c)(1)(A)(i).  The statute does not define the terms "extraordinary" or "compelling".  "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Perrin v. United States, 444 U.S. 37, 42 (1979); see also Smith v. United States, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").  Because the Director of the Bureau of Prisons has been, until the First Step Act, solely authorized to move the Court for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), the Bureau of Prison's interpretation of "extraordinary and compelling" reasons is informative.  The Bureau of Prison's Program Statement entitled "Compassionate Release/Reduction in Sentence:  Procedures for Implementation of 18 U.S.C. §§ 3582[(c)(1)(A)] and 4205(g)" describes, in relevant part, terminal medical conditions and debilitating medical conditions. (Program Statement 5050.50 (Jan. 17, 2019) § 3.a. (describing policy for diagnosis of "terminal, incurable disease", "prognosis, impact of other serious medical conditions, and degree of functional impairment"), § 3.b. (describing policy for incurable, progressive illness or debilitating injury from which the inmate will not recover, and the inmate's physical confinement and ability to self-care); Program Statement 5050.49 (Aug. 12, 2013) § 3.a. (describing the same), § 3.b. (describing the same).

"Although not dispositive, dictionary definitions are 'valuable tools' for approximating the sense in which a linguistic community uses and understands a word and for confirming that an understanding taken as ordinary is not, in fact, idiosyncratic." Struniak v. Lynch, 159 F. Supp. 3d 643, 653 n.11 (E.D. Va. 2016). Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common". *Extraordinary*, Black's Law Dictionary (11th ed. 2019). Although it does not define "compelling", Black's Law Dictionary defines "compelling need" as one "so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary. With these interpretations and definitions as guidance, it is apparent that the record does not support a finding that there are extraordinary and compelling reasons to reduce Adams' sentence.[7]

There is no dispute that Adams underwent surgery in 2013 to remove a brain mass, only part of which was removed to avoid permanent neurological damage. Adams contends that on supervised release he can "obtain essential

---

[7] Although it is unnecessary to address the "applicable policy statements" in United States Sentencing Guideline § 1B1.13 and relevant commentary because there are no extraordinary and compelling reasons warranting a reduction in Adams' sentence, they are the Sentencing Commission's interpretation of "extraordinary and compelling" circumstances and confirm that there are no such circumstances here. See United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, *8-9 (M.D.N.C. June 28, 2019) (finding extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A)(i), then analyzing the policy statements and noting that, while they were applicable to 18 U.S.C. § 3582(c)(1)(A) prior to the First Step Act, they still "provide useful guidance").

8

medical care that is not available in prison" and that he "will be able to find oncologists capable of performing supplemental surgery and chemotherapy". However, fortunately, the tumor was benign and has not been diagnosed as cancerous. The routine MRIs that Adams has undergone since his surgery reveal a stable mass that does not require additional surgery or intervention at this time. Even if Adams were to need surgery or chemotherapy, there is nothing in the record to suggest that the Bureau of Prisons could not provide such medical care.

In addition, Adams argues that Dr. Abud's recommended therapy would be "an extreme burden on the facilities of [his] prison, and may not even be possible" and that "[t]he frequency of [his] need to lie down in a completely silent environment has rendered it impossible to properly function in custody." The only recommended therapies apparent in the record are vertigo rehabilitation, wearing earplugs, and not being "kept in an area where there is too much noise". There is no information on vertigo rehabilitation, much less that the burden it places on the Bureau of Prisons is so extreme as to foreclose that treatment. Furthermore, the Bureau of Prisons noted on Adams' October 1, 2018 Medical Duty Status that he "cannot work or live in areas where there is too much noise" and that he was restricted from all sports, ladders, driving, and work around potentially dangerous machinery. Nothing in the record suggests that FCI Fort Dix is incapable of following those restrictions.

9

Although Adams argues his medical condition makes it impossible for him to function in custody, Dr. Abud's notes do not describe Adams' condition to be so debilitating and nothing in the record suggests that the Bureau of Prisons considers him incapable of functioning as an inmate. Instead, there is evidence that Adams successfully completed several courses as recently as August 2017 – Criminal Thinking Group in March 2017, S.C.O.R.E. Changes for Success and Anger Management Group in July 2017, and The Parenting Program in August 2017, [Doc. #432 at 20-23]. In the warden's March 12, 2019 denial of Adams' request for compassionate release, he found Adams to "have the ability to perform both Instrumental Activities of Daily Living . . . and Activities of Daily Living . . . independently and [that he was] able to fully function in the correctional environment." (Decl. of Dobovish, Attach. B.) Although the warden was evaluating Adams' request in accordance with the Bureau of Prisons' policy, his conclusion is informative and does not support Adams' contention that he cannot properly function in custody. In sum, the record does not suggest, much less support a finding, that Adams faces a medical prognosis – at this time – so unusual or uncommon that his continuing imprisonment would cause irreparable injury.

C.

Accordingly, because it is determined that there are no extraordinary and compelling reasons warranting a reduction in Adams' sentence, see 18 U.S.C.

§ 3583(c)(1)(A)(i), there is no need to assess the applicable policy statements in United States Sentencing Guidelines § 1B1.13 or the factors set forth in 18 U.S.C. § 3553(a) according to which an initial finding of extraordinary and compelling circumstances would necessarily be further evaluated.

IV.

For the reasons explained in this Memorandum, IT IS HEREBY ORDERED that Timothy Adams' Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) [Doc. #438] is DENIED.

This the 8th day of August, 2019.

/s/ N. Carlton Tilley, Jr.<br>Senior United States District Judge